UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| MELISSA STALMACK, | ) | |
| | ) | |
| Plaintiff, | ) | 14 C 4166 |
| | ) | |
| vs. | ) | Judge Feinerman |
| | ) | |
| CAROLYN W. COLVIN, Acting Commissioner of Social Security, | ) ) ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

In March 2011, Melissa Stalmack filed a claim for disability insurance benefits ("DIB") and supplemental security income benefits ("SSI") with the Social Security Administration. Doc. 10-4 at 2-5. Because the disability standards for DIB and SSI are "materially the same," *Donahue v. Barnhart*, 279 F.3d 441, 443 (7th Cir. 2002), and because the parties do not suggest otherwise, the court will ignore the distinction for purposes of this opinion. The Commissioner denied the claim, and then denied Stalmack's request for reconsideration. Doc. 10-5 at 2-6, 8-15. Stalmack sought and received a hearing before an administrative law judge ("ALJ") pursuant to 20 C.F.R. § 404.914. Doc. 10-3 at 65-101. The ALJ denied the claim, *id*. at 10-24, and the Social Security Appeals Council denied Stalmack's request for review of the ALJ's decision, *id*. at 2-4, making the ALJ's decision the final decision of the Commissioner. *See Scrogham v. Colvin*, 765 F.3d 685, 695 (7th Cir. 2014). Stalmack has timely sought judicial review pursuant to 42 U.S.C. § 405(g). Doc. 1. For the following reasons, Stalmack's motion to reverse or remand (Doc. 14) is granted, the Commissioner's summary judgment motion (Doc. 21) is denied, and the case is remanded to the Commissioner for further proceedings consistent with this opinion.

1

## Background

Stalmack has a lengthy medical history, discussed at length in her brief. Doc. 14 at 8-17. For concision, the court will not reiterate that history here, except insofar as it is relevant to the principal issue raised in this appeal: whether the ALJ erred in concluding that Stalmack had a greater residual functional capacity than her primary care physician and her insurance company's independent medical expert had opined. All facts are taken from the administrative record.

### A. Factual Background

Stalmack is 35 years old and previously worked for an auto parts manufacturer as a customer service and delivery representative. Doc. 10-7 at 34. She claims to have become disabled on November 1, 2010, due to a combination of scleroderma, hypothyroid, anemia, migraines, asthma, and hypertension. Doc. 10-5 at 11. She has not returned to work since that time, and currently receives $949 per month in long-term disability insurance. Doc. 10-3 at 74-75.

Stalmack's primary care physician is Dr. David Levy. In February 2011, Dr. Levy filled out an "Interactive Process Questionnaire" evaluating Stalmack's ability to perform the responsibilities of her customer service job. Doc. 10-8 at 118-121. Dr. Levy stated that scleroderma and abdominal pain prevented Stalmack from performing her job functions because she "cannot stand at this point for any prolonged activity period" and because there were no reasonable accommodations for her "chronic pain." *Id*. at 119. In April 2011, Dr. Levy filled out another form, titled "Medical Evaluation—Physician's Report." Doc. 10-8 at 102-05. There, Dr. Levy stated that Stalmack suffered from scleroderma, a pulmonary embolism, and endometriosis. *Id*. at 102. He rated her as having "more than 50% reduced capacity" during an eight-hour workday in the following categories: bending, climbing, travel (public conveyance), and performing activities of daily living. *Id*. at 105. He rated her at "20 to 50% reduced

capacity" in standing, turning, pushing, pulling, and fine and gross manipulation. *Ibid*. Finally, he stated that Stalmack could lift no more than 10 pounds at a time during the workday. *Ibid*. Also in April 2011, Dr. Levy completed a Statement of Continued Disability for Stalmack's insurer, *id*. at 110-11, but the copy in the record is largely illegible.

In October 2012, Dr. Levy submitted a "Physical Capacities Evaluation" indicating that Stalmack could not adequately use either hand for grasping, pushing and pulling, fine manipulation, or repetitive motion tasks such as writing, typing, and assembly. Doc. 10-14 at 19-22. He also indicated that Stalmack could lift or carry no more than five pounds, and only on an "occasional" basis (that is, up to one-third of the day). *Id*. at 20. Dr. Levy opined that Stalmack suffered from disabling fatigue and pain that prevented her from working full time, even in a sedentary position. *Id*. at 20-21. Finally, Dr. Levy stated that Stalmack's pain constituted a "significant handicap with sustained attention … [that] would eliminate skilled work tasks." *Id*. at 22.

Several other doctors evaluated Stalmack in 2012; three in particular are worth mentioning, because the ALJ relied on their impressions in discounting Dr. Levy's October 2012 opinion. The first is Dr. Troy Buck, who saw Stalmack at the Loyola Pain Medicine Clinic in January 2012. Doc. 10-10 at 99-102. Stalmack told Dr. Buck that her pain had gotten worse, rating its intensity as 7/10, and reported new pain and numbness from her neck to her fingers. *Id*. at 99. The second is Dr. Rochella Ostrowksi, a rheumatologist who saw Stalmack in April and May 2012 for localized scleroderma. Doc. 10-11 at 48-52. In April, Dr. Ostrowski noted a lesion in Stalmack's right chest wall, and wrote that Stalmack had "widespread pain, but overall improved on current pain regimen." *Id*. at 49-50. When Stalmack returned the following month, Dr. Ostrowski noted that the lesion had "improved significantly," and that although she "[s]till

3

has fibromyalgia pain," it appeared "somewhat improved with current regiment; occasionally has sharp pain going into all extremities. No associated numbness/tingling." *Id*. at 48. The third is Dr. Rosenbaum, a gastroenterologist whose first name is not in the record. Dr. Rosenbaum saw Stalmack in August 2012, Doc. 10-11 at 46-47, but, as stated by the ALJ, "did not give a diagnosis or report clinical signs." Doc. 10-3 at 21.

In December 2012, Dr. Anand Lal reviewed Stalmack's medical charts and conducted a physical examination on behalf of Hartford Life Insurance, Stalmack's insurer. Doc. 10-14 at 24-30. Dr. Lal opined that Stalmack could stand for 1.5 hours a day, 15-20 minutes at a time, that she could sit three hours a day with some stretching, and that she could lift about 12 pounds of weight occasionally. *Id*. at 29. He estimated that Stalmack was reasonably capable of working "4.5 hours a day … and 22.5 hours/week on a good day." *Id*. at 30. But "[o]n a bad day," Dr. Lal wrote, Stalmack "may not be able to do any [work] at all." *Ibid*.

Stalmack was also evaluated by three different state agency medical consultants during the course of her application: Dr. Manesh Shah, Dr. Richard Smith, and Dr. Charles Kennedy. Dr. Shah performed a consultative examination for the Bureau of Disability Determination Services in July 2011. Doc. 10-9 at 53-57. He indicated that Stalmack's "[f]inger grasp and hand grip [were] unimpaired bilaterally" and that her "[f]ine and gross manipulations were intact." *Id*. at 56. Dr. Shah observed mild pain and stiffness in Stalmack's right shoulder and tingling and numbness in her fingers, but stated that "the physical exam is fairly unremarkable"; he also stated that Stalmack's asthma, blood pressure, and migraines were all "ok" or under "fair" or "good control." *Id*. at 57.

One month later, Dr. Smith assessed Stalmack. *Id*. at 58-65. Dr. Smith indicated that Stalmack could occasionally lift 20 pounds and could frequently lift 10 pounds, and found that

4

she could stand or walk for six hours a day. *Id*. at 59. Dr. Smith found no limitations in handling, fingering, or feeling, with only occasional reaching overhead. *Id*. at 61. Additionally, he stated that Stalmack's grip was "normal" and that her alleged impairments "could reasonably be expected to produce the alleged symptoms, but their intensity and the effect on functioning are not consistent with the total file of evidence." *Id*. at 65.

In March 2012, Dr. Kenney assessed Stalmack. Doc. 10-10 at 68-75. He opined that Stalmack could lift up to 20 pounds occasionally and 10 pounds frequently during the workday and that she could stand or walk with normal breaks for at least two hours. *Id*. at 69. He also opined that Stalmack had no limitations in reaching, handling, or fingering, but some limitations in feeling because of numbness in the tips of her fingers. *Id*. at 71.

### B. The Administrative Hearing

Stalmack's attorney opened by arguing that the combination of her impairments made it difficult for her sit, stand, walk, or perform tasks requiring fine motor dexterity. Doc. 10-3 at 71-73. Stalmack then testified about her work history and current living situation. *Id*. at 73-76. She explained that "I spend most of my day laying horizontally with my legs up due to swelling …. Sitting is difficult, standing and walking's difficult." *Id.* at 76. Asked why she did not feel she could work full-time, Stalmack said:

> I'm always tired; I know my mind wouldn't be on my work. I would mess up because if I had to move something I could possibly drop it because my hands I can't use. I swell in my legs and my arms, so I have limited use of that. So I know even if I was sitting I couldn't sit and do the job because my legs would get the shooting pains. And if I'm standing trying to do a job I'm getting the shooting pains down my arms. There's no way I could possibly, with the fatigue and the pain, handle a full time job.

*Id*. at 77-78. Stalmack also told the ALJ that she could not sleep more than a few hours at a time without being awoken by pain. *Id*. at 78. She described the sensation in her hands as "numbness, tingling, and … severe[] cold," *id.* at 79, and said she could not stand for more than

5

five minutes or sit for more than 15 or 20 minutes without needing to change position, *id*. at 80.
Twice during the hearing, Stalmack asked if she could stand because her seated position was
causing her pain; after the second such episode, the ALJ told her she did not need to ask
permission. *Id*. at 69, 79. Stalmack estimated that she could not lift more than five pounds
comfortably. *Id*. at 80.

Stalmack testified that she had previously weighed 200 pounds but had gained almost
100 pounds since she stopped working one year earlier. *Id*. at 87. She claimed to suffer from
migraines and stated that her medications caused her to become tired, nauseous, and light-
headed, and that she had difficulty bending over to dress or wash herself. *Id*. at 89-90. Finally,
Stalmack said that she wanted to return to work but was unable to get better. *Id.* at 91.

The ALJ then posed three hypotheticals to the vocational expert ("VE"), Thomas
Dunleavy, about the employment outlook for someone with Stalmack's age, educational
background, and work experience. First, the ALJ asked what that person's outlook would be if
they could lift and carry less than 10 pounds frequently and 10 pounds occasionally, sit up to
eight hours a day, and stand and walk for one hour a day. The VE stated that such a person
could work as a sorter, visual inspector, or as a particular kind of cashier, jobs that all existed in
substantial number in Illinois's economy. *Id*. at 93-95. Second, the ALJ asked about the
prospects if that individual needed to stand and walk briefly each hour as part of her one hour of
daily standing time. The VE believed that such a person would be able to perform the jobs just
listed. *Id*. at 96-97. Finally, the ALJ asked the VE to suppose that the individual could not lift
more than five pounds frequently. The VE stated that such a person could still serve as a sorter
or a visual inspector, though not a cashier, because the cash drawer could weigh more than five

6

pounds. *Id*. at 97-98. He also stated that employees in these jobs could be absent no more than 10 days per year, and not more than one day in the first two to three months. *Id*. at 99.

### C. The Commissioner's Decision

On February 1, 2013, the ALJ issued a decision finding that Stalmack was not disabled and was therefore ineligible for benefits. Doc. 10-3 at 13-24. The ALJ followed the "five-step sequential evaluation process" for determining whether a claimant is disabled. *See* 20 C.F.R. §§ 404.1520(a)(4)(i)-(v) (listing the steps); *Weatherbee v. Astrue*, 649 F.3d 565, 569 (7th Cir. 2011) (describing the steps). Only the fourth step, in which the ALJ "assesses an applicant's residual functional capacity (RFC)," is in dispute. *Weatherbee*, 649 F.3d at 569.

The ALJ began the RFC analysis by stating that Stalmack's medically determinable impairments could reasonably be expected to cause the alleged symptoms, including pain in her arms and legs, fatigue, numbness in her fingers, difficulty swallowing, and difficulty standing or walking. Doc. 10-3 at 20. However, in the ALJ's words, "the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible" because they were inconsistent with physical examinations and were often not linked to any medically determinable impairments. *Id*. at 20-21.

The ALJ then turned to the opinions of Stalmack's physicians, beginning with Dr. Levy. The ALJ did not give Dr. Levy's October 2012 opinion controlling weight, but did afford his earlier assessments "moderate weight" and agreed with him that Stalmack's "subjective pain precludes the performance of skilled work tasks." *Id*. at 21-22. The ALJ gave little weight to Dr. Lal's opinion that Stalmack could not work more than five hours a day. *Id*. at 22. The ALJ also discounted the opinions of the state agency medical consultants, Dr. Smith and Dr. Kenney, finding them inconsistent with the limitations indicated by the other evidence. *Ibid*.

The ALJ ultimately concluded that Stalmack was capable of "limit[ed] … sedentary exertion, sitting up to 8 hours, with the ability to stand and walk for 2-3 minutes every half hour but a total of no more than 1 hour" and "[l]ifting, carrying[,] pushing[,] and pulling no more than 10 pounds." *Ibid*. Based on the RFC finding and the VE's testimony, the ALJ determined that Stalmack was capable of performing a job that exists in significant numbers in the national economy and thus was not disabled. *Id*. at 23-24.

## Discussion

A claimant is disabled under the Social Security Act if she is unable to perform "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The claimant has the burden of showing that her impairments prevent her from performing prior employment and any other job generally available in the national economy. *See* 42 U.S.C. § 423(d)(2)(A). As noted above, because the Social Security Appeals Council declined to review the ALJ's decision that Stalmack was not disabled, the ALJ's decision became the Commissioner's final decision.

Section 405 of the Social Security Act authorizes judicial review of the Commissioner's final decision. *See* 42 U.S.C. § 405(g). The court reviews the Commissioner's legal determinations *de novo* and her factual findings deferentially, affirming those findings so long as they are supported by substantial evidence. *See Jones v. Astrue*, 623 F.3d 1155, 1160 (7th Cir. 2010); 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive"). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion"; it

"must be more than a scintilla but may be less than a preponderance." *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007) (internal quotation marks omitted). If the reviewing court finds that the Commissioner's decision is not supported by substantial evidence, "a remand for further proceedings is [usually] the appropriate remedy." *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 355 (7th Cir. 2005). Moreover, the court "cannot uphold an administrative decision that fails to mention highly pertinent evidence," *Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010), or a decision containing errors of law, *Collins v. Astrue*, 324 F. App'x 516, 519 (7th Cir. 2009).

In addition to satisfying these standards, the Commissioner's opinion must build an "accurate and logical bridge from the evidence to [the] conclusion so that [the] reviewing court[] may assess the validity of the agency's ultimate findings and afford a claimant meaningful judicial review." *Young v. Barnhart*, 362 F.3d 995, 1002 (7th Cir. 2004) (internal quotation marks omitted); *see Briscoe*, 425 F.3d at 351 ("In addition to relying on substantial evidence, the ALJ must also explain his analysis of the evidence with enough detail and clarity to permit meaningful appellate review."); *Zurawski v. Halter*, 245 F.3d 881, 888 (7th Cir. 2001) (holding that the Commissioner must "articulate at some minimal level [his] analysis of the evidence to permit an informed review") (internal quotation marks omitted). To build a logical bridge, the Commissioner must "sufficiently articulate his assessment of the evidence to assure [the court] that he considered the important evidence and to enable [the court] to trace the path of his reasoning." *Hickman v. Apfel*, 187 F.3d 683, 689 (7th Cir. 1999) (internal quotation and alteration marks omitted). The court "cannot uphold a decision by an administrative agency … if, while there is enough evidence in the record to support the decision, the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996).

### A. Dr. Levy

Stalmack's first contention is that the ALJ should not have set aside Dr. Levy's October 2012 opinion about her limitations in lifting and using her hands and feet. Doc. 14 at 24-38. An ALJ must give "controlling weight" to the medical opinion of a treating physician, but only "if it is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence.'" *Larson v. Astrue*, 615 F.3d 744, 749 (7th Cir. 2010) (quoting 20 C.F.R. § 404.1527(c)(2)); *see Roddy v. Astrue*, 705 F.3d 631, 636 (7th Cir. 2013); *Scott v. Astrue*, 647 F.3d 734, 739 (7th Cir. 2011); *Punzio v. Astrue*, 630 F.3d 704, 710 (7th Cir. 2011). Thus, an ALJ may discount a treating physician's opinion if the ALJ offers "good reasons" for doing so. *Larson*, 615 F.3d at 749 (internal quotation marks omitted). Put another way, "[e]ven though the ALJ [is] not required to give [the treating physician's] opinion controlling weight, [the ALJ is] required to provide a sound explanation for his decision to reject it and instead adopt [a contrary] view." *Roddy*, 705 F.3d at 636 (citations omitted).

The ALJ here first explained that Dr. Levy was not a specialist in rheumatology, gastroenterology, or pain management. Doc. 10-3 at 21. This was appropriate, as the Social Security Agency "generally give[s] more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist." 20 C.F.R. § 404.1527(c)(5). Less appropriate was the ALJ's decision to reject Dr. Levy's October 2012 opinion as inconsistent with his previous opinion and with the other medical opinions in the record. The ALJ reasoned as follows:

> Eighteen months after [Dr. Levy's April 2011 report], Dr. Levy wrote [the October 2012 report], limiting the claimant to lifting only 5 pounds and opining that she could not use her bilateral hands or feet adequately. He bases this assessment on diagnoses of scleroderma, anemia and asthma. I find no support for such extreme limitations in Dr. Levy's notes, nor in the notes of Dr. [B]uck, Dr. Ostrowski or Dr. Rosenbaum. Very little weight is given to

>     [the October 2012 report]. There is no objective evidence that the claimant's
>     condition deteriorated in the 18 months after April 2011.

Doc. 10-3 at 21.

The trouble with this explanation is that the two reports used different metrics. The April 2011 report used a four-part scale to assess lifting capacity: "No more than 10 pounds at a time"; "No more than 20 pounds at a time with frequent lifting of up to 10 pounds"; "No more than 50 pounds at a time with frequent lifting of up to 25 pounds"; and "No more than 100 pounds at a time with frequent lifting of up to 50 pounds." Doc. 10-8 at 105. The October 2012 report, by contrast, provided five weight ranges, from as low as 0-5 pounds to as high as 51-100 pounds, and asked whether the patient could lift those amounts "never," "occasionally," or "frequently." Doc. 10-14 at 20. In April 2011, Dr. Levy stated that Stalmack could not lift more than 10 pounds—the lowest possible functional rating allowed by that report. Doc. 10-8 at 105. In October 2012, Dr. Levy said Stalmack could lift 0-5 pounds "occasionally" but could "never" lift any higher weight range. Doc. 10-14 at 20. The ALJ appeared to believe that the latter response indicated more serious functional limitations than the former. But the April 2011 report did not allow Dr. Levy to indicate whether Stalmack could lift only 0-5 pounds, so the two responses are not necessarily inconsistent. It could very well be that Dr. Levy thought Stalmack could not lift more than five pounds at both junctures.

Dr. Levy's assessments of Stalmack's ability to use her hands and feet must also be considered carefully. The April 2011 report assessed functioning in terms of an eight-hour work day: Dr. Levy stated that Stalmack had "20 to 50% reduced capacity" in pushing, pulling, fine and gross manipulation, and "more than 50% reduced capacity" in ability to perform activities of daily living. Doc. 10-8 at 105. The October 2012 report asked only whether Stalmack could "adequately" use her hands for simple grasping, pushing and pulling, fine manipulation, or

11

repetitive motion tasks, or her feet for repetitive movements. Doc. 10-14 at 19. It is not clear how the two scales map on to each other—not clear, in other words, what percentage of normal capacity a claimant must have during the workday to perform a task "adequately." But again, there is nothing inherently inconsistent in stating that a claimant with up to a 50% reduced capacity in pushing and pulling is unable to adequately perform that task. Certainly the ALJ did not explain why she thought there was an inconsistency.

Because the ALJ provided no sound reason why Dr. Levy's evaluation in October 2012 reflected greater functional limitations than his April 2011 evaluation, the ALJ should not have dismissed the conclusions October 2012 report simply for lack of evidence that Stalmack's "condition deteriorated in the eighteen months after April 2011." Doc. 10-3 at 21. In her brief, the Commissioner points out other possible inconsistencies between the two opinions. Doc. 22 at 7-8. In October 2012, for example, Dr. Levy stated that Stalmack could stand or walk for only an hour per day, while in April 2011 he reported that Stalmack's capacity to stand during an eight-hour workday was reduced by 20 to 50%—implying that she could stand up to four hours. But the ALJ never mentioned this inconsistency in rejecting Dr. Levy's opinion, and instead relied only on the lifting and hands and feet assessments. The Seventh Circuit has repeatedly warned that under the *Chenery* doctrine, "the government may not provide the missing justification for an ALJ's decision." *Phillips v. Astrue*, 413 F. App'x 878, 887 (7th Cir. 2010) (citing cases); *see also Hanson v. Colvin*, 760 F.3d 759, 762 (7th Cir. 2014) (citing cases). Although the ALJ might well continue to give Dr. Levy's opinion less than controlling weight on remand for this or other reasons, the decision under review lacks a "sound explanation" for setting aside his opinion. *Roddy*, 705 F.3d at 636.

The ALJ also failed to address Dr. Levy's statement in the October 2012 report that Stalmack's fatigue and pain were "disabling to the extent that it prevents the patient from working full time, even in a sedentary position." Doc. 10-14 at 20-21. This, too, was error. "Even if [the treating physician's] opinion of [the claimant's] ability to work is not a 'medical opinion,' that does not mean that the ALJ should have ignored the statement. Although the ALJ does not give any special significance to such opinions, he still must consider opinions from medical sources in determining the claimant's residual functional capacity." *Roddy*, 705 F.3d at 638 (internal quotation marks and citations omitted); *see also Bjornson v. Astrue*, 671 F.3d 640, 647 (7th Cir. 2012) ("The pertinent regulation says that 'a statement by a medical source that you are 'disabled' or 'unable to work' does not mean that we will determine that you are disabled.' 20 C.F.R. § 404.1527(e)(1). That's not the same thing as saying that such a statement is improper and therefore to be ignored."). Dr. Levy's impression of Stalmack's ability to work full-time directly contradicted the ALJ's RFC determination that Stalmack had the ability to "perform sedentary work." Doc. 10-3 at 19. At the very least, Dr. Levy's opinion ought to have been expressly considered.

**B.     Dr. Lal**

Stalmack next argues that the ALJ wrongly disregarded Dr. Lal's opinion from December 2012. Doc. 14 at 28-29. Although Dr. Lal was not Stalmack's treating physician, he formed his opinion by reviewing her medical charts and performing a physical examination. Additionally, because he was hired by Stalmack's insurance company, he presumably had no bias towards determining that Stalmack was unable to work. Dr. Lal concluded that Stalmack could work only 4.5 hours on a good day and not at all on a bad day. Doc. 10-14 at 30. The ALJ gave "very little weight" to Dr. Lal's conclusion:

> I give very little weight to Dr. Lal's opinion that the claimant cannot sustain more than 4 to 5 hours a day of work activity. This opinion appears to be based on the diagnosis of fibromyalgia and generalized tenderness all over her body on physical examination. In contrast, Dr. Lal's neurological exam was normal except for grip strength reduced to 2-3/5, where the patient has control of grip testing. Yet Dr. Lal also opines that reaching, fingering and handling are not limited and claimant can lift 12 pounds. I agree that the claimant can lift up to 10 pounds, as her primary care physician [Dr. Levy] stated in 2011, and that she should not stand/walk more than a total of 1 hour, with breaks every half hour. The inconsistency between Dr. Lal's grip, lifting and manipulative findings caused me to be skeptical of Dr. Lal's overall opinion.

Doc. 10-3 at 22.

This explanation is unpersuasive. There is nothing facially inconsistent about a patient with moderately reduced grip strength who can nonetheless lift light weights and manipulate her fingers. The Commissioner's brief repeats the ALJ's reasoning but merely states, without further explanation, that "the ALJ reasonably credited those portions of … Dr. Lal's opinion that were consistent with the record as a whole and rejected those that were poorly supported, such as the three-hour sitting restriction." Doc. 22 at 9. But the ALJ never mentioned a three-hour sitting restriction in rejecting Dr. Lal's opinion. Rather, the ALJ rejected his "overall opinion" because of an unexplained inconsistency "between Dr. Lal's grip, lifting and manipulative findings." Doc. 10-3 at 22.

As noted above, an ALJ must "sufficiently articulate [her] assessment of the evidence to assure [the court] that [she] considered the important evidence and to enable [the court] to trace the path of [her] reasoning." *Hickman*, 187 F.3d at 689 (internal quotation marks and alterations omitted). As with Dr. Levy, the court does not hold that the ALJ must conclude that Dr. Lal's opinion deserves significant weight. But because the court is unable to follow the ALJ's reasons for setting aside Dr. Lal's opinion, remand is appropriate on this ground as well.

14

### C. Stalmack's Other Arguments

Stalmack's brief advances several other arguments. As the ALJ will have the opportunity to reconsider other aspects of her decision on remand, it is not necessary to consider those other arguments here. *See Fox v. Astrue*, 2010 WL 1381662, at *6 (S.D. Ind. Mar. 30, 2010) ("[B]ecause on remand the ALJ will reconsider the mental health evidence and restrictions … that process is likely to also [a]ffect the ALJ's view of [the claimant's] overall credibility. Under these circumstances, the court cannot affirm the ALJ's credibility analysis."); *Hudson v. Astrue*, 2009 WL 2612528, at *14 n.6 (N.D. Ill. Aug. 24, 2009) ("In light of this remand order [to reassess an RFC determination], we find it unnecessary to address the other arguments that plaintiff has raised. On remand, the ALJ will be free to re-examine and reassess those points, including … his credibility decisions in determining plaintiff's RFC."). That said, a word on one of Stalmack's other arguments is appropriate.

Stalmack contends that the Appeals Council denied her appeal without even considering supplemental statements submitted by Stalmack's mother and father in support of her claim. Doc. 14 at 21-22, 36. The Commissioner does not respond to this contention. In her reply brief, Stalmack cites authority suggesting that such statements can be considered in Social Security cases. *E.g.*, *Dodrill v. Shalala*, 12 F.3d 915, 918-19 (9th Cir. 1993) ("friends and family members in a position to observe a claimant's symptoms and daily activities are competent to testify as to her condition"). Although it is not clear that the letters provide any new information not provided by Stalmack's own testimony at the administrative hearing, the ALJ might take the opportunity to at least address these materials on remand.

**Conclusion**

For the foregoing reasons, Stalmack's motion to reverse or remand is granted, the Commissioner's summary judgment motion is denied, and the case is remanded to the Commissioner for further proceedings consistent with this opinion.

June 10, 2015

United States District Judge